Case number 20-1010, Local 23, American Federation of Musicians, Petitioner v. National Labor Relations Board. Mr. Ginsberg for the petitioner, Ms. Rajapaksi for the respondent. Good morning, counsel. Mr. Ginsberg, please proceed when you're ready. Yes, good morning, your honors, and may it please the court, Matthew Ginsberg on behalf of the petitioner, Local 23 of the American Federation of Musicians. Your honors, this case demonstrates concretely the importance of the right of employees to engage in Section 7 activity at their principal workplace. The musicians in this case routinely perform at the Tobin Center for the center's three principal performing arts companies, the symphony, the ballet, and the opera. There's no serious doubt that the Tobin Center and no other location constitutes the musician's principal workplace throughout the annual performance season. On the weekend in question, the musicians sought to stand on the sidewalk in front of the Tobin Center's main entrance to hand out leaflets to patrons who were attending the ballet's opening weekend performance of Tchaikovsky's Sleeping Beauty. The leaflets asked patrons to support the musician's request that the ballet employ members of the musicians union to perform live music to accompany the ballet's dancers, rather than use pre-recorded music as the ballet had planned. There was really no other location where the musicians could practically convey this message to their intended audience. Like most performing arts organizations, the ballet is supported by a relatively small number of committed patrons and benefactors who purchase subscriptions for the ballet's annual seasons of performances and who make financial contributions to support the ballet's ongoing operation. The musicians targeted these supporters with their leaflets because the musicians understood that the ballet cares a great deal about its audience's views on matters such as the use of live music. And the musicians reasonably expected that many of the ballet's most committed patrons and benefactors would be attending the opening weekend performances of the ballet's new presentation. Yet despite the musician's strong connection to the Tobin Center and the fact that there was no other practical location where the musicians could exercise their Section 7 rights, the board upheld the Tobin Center's decision to prohibit the musicians from leafleting on the sidewalk outside the center's main entrance. Mr. Ginsburg, in New York, New York 1, we recognize that the critical question left to the discretion of the board was, quote, whether individuals working for a contractor on another's premises should be considered employees or non-employees of the property owner. Does that suggest that it's within the board's discretion to apply the same test to contractor employees as applied to the non-employee union organizers in Lechmere? So we have no dispute that the board has discretion in this area to change its rule. Even to equate Section 7 employees like these to non-employees in Lechmere? Well, if I can take your question in two bites, yes, they could apply a test that they came up with, not this test for reasons I'll explain, to find some contractor employees are essentially equivalent to non-employees. But they can't apply the test they articulated here because it is not rational. It does not balance the property interest with the employee's Section 7 interest. It also is not the test that the board applied pre-New York, New York, which is what it says it's doing here, but it's actually not the case. And it certainly, we don't think, can apply that test to employees like these who have a very, very strong connection to the workplace and in any balancing ought to have some opportunity. The extent could be within the board's discretion, but some opportunity. If we were to agree with you that the application here of the works regularly at the property owner's premises was arbitrary as applied and that the exclusively requirement was arbitrary as a requirement, what about the other ground, the other available means? Is that defective? Yes. Alternative means of communicating the message and how so? What's the attack on that? Well, the attack on that is that it is applying the same test as in Babcock and Wilcox and Lechmere, which is a test applied to non-employee union organizers who have only a derivative interest in exercising Section 7 rights on the property to individuals who are employees who have personal non-derivative interest in exercising their rights on the property. Didn't the board here say these were derivative because they're not the employees of the Tobin Center? I'm not sure the board said that specifically, but we dispute that. The interest at play here are non-derivative interests. Now, obviously, we acknowledge the relationship between the employees and the Tobin Center is one of employees and property owner, like in New York, New York. But still, the particular Section 7 interest that must be considered in the balance is a personal non-derivative interest, unlike that. This gets back a little bit to the question that Judge Pillard asked earlier, because if it's permissible to equate contractor employees to non-employee organizers, at least in some situations, if it's permissible, and then that's what the agency did here, then it seems like it's at least within the zone of permissibility. So your argument wouldn't be one that the agency's just barred from doing it on this criterion, right? That's correct. So, for example, employees who had a very limited, loose relationship to the property might, when the balancing was complete, end up with the same rights as non-employee union organizers. Again, that would not be the case in a case like this one, where you have employees who are there routinely and primarily. So you think on the facts of this case, there's just no – the board is just not permitted to come up with any test under which the reasonable alternative means of communication could be taken into account in a way that endures to the benefit of the property owner? Okay. I'm sorry. Perhaps I misunderstood that piece of the question before. I think the board perhaps could come up with such a test. And, in fact, if you look – I guess the way I would think about it is that the exclusively part of the board's test looks at whether the employees primarily work there. What is the strength of the relationship to the property similar to – and relies on cases like postal service and the dissent in DiBartolo where the question was, is there an alternative location where the employees can exercise their Section 7 rights? And so, in a way, the second step of the board's test here sounds in the same vein. The problem with the test as the board has articulated it here, though, is that it is exactly those contractor employees who meet this very strict and, we argue, arbitrary test of regularly and exclusively who then have to go on and yet again prove this no reasonable alternative test, which the board has already determined what is reasonable and what is not. And it's a very difficult test to make. So, I mean, the board could craft a test that takes into account reasonable alternatives. It's just not the test that they've articulated here. So, tell us more about that. Here we have a record where, on the one hand, there's a discussion of alternative non-trespassory means of going across the street, but then the board also throws in, I think – correct me if I'm wrong – without any record, evidence one way or the other about social media or mass media, you know, how readily or effectively these patrons could be targeted by that. But they throw that in, too. So, how should we think about this? You talk about – I'm just throwing a lot of things on the table – but you talk about that it's an illusory difference to shift the burden on this prong from the property owner to – from the employees to the property owner. What do we have to decide and what should we decide on this issue? Well, I think if you agree with our argument that the first test about the sufficiency of the connection to the property is arbitrary. I'm not saying one way or the other, but to isolate the inquiry, yes. Assume that we were to agree with you on the first part of the test. Then I don't think you need to reach the second part of the test because you would, I believe, remand to the board. And in doing so, they could consider the test as a whole. And for the reasons I explained, there are good reasons to let the board consider the test as a whole on remand. And that's because, as you see it, the alternative means only becomes a relevant inquiry if the relationship between the employees and the center is tenuous in the way that analogizes it to the union members in Lechmere – I mean the organizers in Lechmere. Well, that would be, I think, a reasonable way for the board to think about it, but it's certainly not what the board did here. I mean the board was very clear here that they said you only reach the second step if you surmount the first step of the regularly and exclusively test. And just to be very clear about it, we think the idea that contractor employees have to show that they exclusively work for their contractor at a property is totally arbitrary. It has no basis in the board's case law. So if you find that – I'm sorry, Your Honor. Right, so if we assume that you're right – just assume for argument's purposes that you're right on regularity and exclusivity, then there's this third prong of the test, reasonable alternative means. And the question becomes, so suppose the board constructed its inquiry so that it said there's two independent bases that anyone could look at. You could look at regularity slash exclusivity, or you could look at reasonable alternative means. Either one of them could be enough in any particular case to deem the property owner as having sufficient property-based interest to exclude the contractor employees. And here we find that both of them cut in the same direction, but we could have done it based on either ground. But in that situation, if we thought that the application of one of those, regularity, exclusivity, is arbitrary, then would you still say, well, you have to remand? Or would you say, well, no, there's another one that was also found to be in the property owner's favor, and so we'd have to win both? No. The way I understand the board's test, and I think this is quite clear, is that you don't reach what I'm calling step two. Your Honor called step three the reasonable alternative, that you don't even reach that if you don't get past the first step of regular and exclusive. I think that's true. So let's just – just to be clear, let's say 1A, 1B, and 2. Okay. So the question would be, is the one grouping and two, are they independent? Are they potentially independent? Or is the board saying, you can only ever get to two if there's regularity and exclusivity under one? And I see – if you're right, that you can only ever get to two if the employer – if the property owner wins on 1A, 1B, then I understand what you're saying. But if the board is saying, yeah, that's typically how you do it, but, I mean, obviously you can just skip straight to two if the property owner is going to win under two anyway. I don't read the board's decision that way. I think that they're very clear that you have to surmount 1A and 1B before you even get to two. I guess what I was asking before is to tell us more in your view why. I mean, I think – I understand that there's a reading of the board's opinion that runs that way. And what I was saying was – my understanding of that roughly was it's only when there's a non-regular and or non-exclusive workplace at the premises that those workers then become akin to the union organizers in Lechmere and therefore subject to that more readily met employer analysis about alternative means. Because you don't usually apply, for example, to an alternative means inquiry to full employees of an employer at a workplace, right? Correct. So that was sort of what I was posing as – like asking, is that your theory? And I thought you were a little bit pushing back on that before. So I'm just trying to understand your theory of the board's opinion and what the logic is that the alternative means inquiry only arises if the workplace is either not the regular place of work for these employees or not the exclusive place. Okay. I'm going to try to sort all this out because I apologize if I've confused you, Your Honor. So two things. One is we're very clear our reading of the board's decision is that you only reach step two if the employees meet steps 1A and step 1B in the chief judge's schema. And the reason the board – and I think it's clear from particularly the outset of the board's decision – the reason the board wrote its test this way is that it wanted to limit to a very great degree the right of contractor employees to exercise their rights on a third-party property owner's property. So it was intentionally written so you both had to show regularity and exclusivity, and you had to show that no alternative means were available. So you would not even reach step two without completing step one. I think I may have created some confusion. I understood you, Judge Pillard, to be asking whether there was another test that could theoretically the board in another case could articulate that would use the step two differently in a different manner, whether the step two could ever be appropriate for contract employees. And my answer to that was perhaps, yes. I mean, the board has discretion to put together a test, and you could imagine a scenario where that was part of its test. But it wouldn't be this test. This test, we think, is arbitrary for the reasons we said in the brief. I know I'm out of time. I'm happy to keep answering questions. Could you just tell us a little bit why is this test arbitrary? Assuming that these employees were not regular employees at this site, then what's defective about this test? So what's defective about the test is that, remember, the background from this court's decision in New York, New York 2, is that the board has discretion but must accommodate the Section 7 interest and the property interest. Here, the exclusivity test is so stringent, if you ever work I was saying, assume they're not, I'm putting this actually on purpose, putting aside the exclusivity prong. Just saying, assume they fail the regularity prong. They're really just not regularly employed there. Do you, in that situation, is this version of the alternative means analysis still defective? And if so, why? I guess my understanding, again, of the board's decision is that if a particular set of contract employees did not meet the regularity part of the test, you would not then go to Part 2. Now, it may be, it might be in that case that the employees who having being told they are the functional equivalent of non-employees could come in and make a straightforward leechmere claim. Say, you know, you've told us we're just like non-employees, so we're going to try to meet the leechmere test. But under the board, the way the board has written its decision here, we think it's very clear that you don't get to Step 2 if you're not regularly employed. Now, just to be That seems like that has to be right, because you, for the, the way the board's constructed the inquiry, the property owner has to win on both regularity and exclusivity in order to not get to 2. Otherwise Right, I guess, right, you're right. That was a non-question question. I see the problem. But let's say that the board is looking at facts and saying, well, we could either go on non-regularity or go on availability of alternative means. And this is, again, we're just probing the sequence question and why, why it's sequential. Could the board, without finding one way or the other, on regularity, say, well, in any event, there were adequate alternative means? Because I guess I'm thinking going forward, if we were to accept the board's test as consistent with the property rights and Section 7, would it be open to employers simply to go straight to alternative means and just say, well, there's the internet. Well, there's the internet. And obviously, this is something we can ask to Miss Rajapaksi, but In your view is, no, they couldn't. They, they actually have to first be determined to be in this category of employees who are not regularly and exclusively So I think, so Judge Pillard, so an employer, I assume, under the board's test articulated here, could come in and say, look, we'll make it simple for you. They don't meet test prong two, so you don't even have to get into prong one. That may be true for the employer, but for the employees, the employees can't. This is what's what's so wrong with the test is if, if you are a non-employee union organizer and a leechmere, all you have to do is come in, not that it's easy, but come in and say, Hey, look, there's no reasonable alternative means of communication available. We have to be let on the property. But the way the board has articulated its test, a contractor employee not only has to make that showing, but then it has to go back and make the other showing that they're regularly and exclusively employed on the property. So the way the board has articulated its test is it holds contractor employees who have personal Section 7 interests to a higher standard than non-employee union organizers. And we just think that can't be right. So I think you're right that an employer could do that. But from the employee's point of view, you have to meet both prongs of the test in order to be able to access the property to exercise your Section 7 rights. And we think that that just cannot be correct. It's not on the continuum between Republic Aviation and leechmere. So, okay. Thanks. Further questions. If I could have a minute or two for rebuttal. I have questions. I may be on a frolic of my own, but I have a hard time seeing the Section 7 right here. I know it's given. I know it's not a given. I know it's not contested. But it's like that movie or book, Six or Seven Degrees, whatever it is, of separation. You've got a property owner that's not the subject of the leafleting. You've got a licensee of that property owner whose beef, which is characterized by the ALJ as, quote, to increase their employment opportunities in conjunction with the performances of the ballet, nothing to do with Tobin Center. It's beef is with not the property owner, but with another licensee. And I guess my question is this. Could these musicians hand out leaflets that attacked something that was unfair to them they felt from Majestic Theater? In other words, they weren't being paid enough by Majestic Theater. Not that they were using canned music like the ballet was. You mean that could they hand out leaflets at Tobin Center about another employer? Well, another venue. The Tobin Center is not their employer. And here's the problem I see. New York, New York, those ARC employees who worked in restaurants and supplied all the food for the casino, they wanted to join the same union that the casino employees were members of. And the same union organizing, so forth, all the way down the line with these cases. And now you have a case where one licensee is fighting another licensee that the property owner doesn't have a dog in that fight. And so what would stop these musicians from stopping the patrons of the Tobin Center with leaflets that say, we don't make enough from Majestic Theater? And while I'm thinking about it, another question is this, you've sort of thrown off on the social media as the alternative access. But if you look at the leaflet, it takes you to Facebook or FaceTime, whatever it is. And when you get there, it's a plea to, as they put it, the big dog donors of the opera, the ballet and the symphony. And then they say, quote, even the Tobin Center, the big dog donors of the Tobin Center. So that's a long winded wind up. Well, I'll do my best. So I think the key point I want to emphasize here is that the musicians already had a relationship with all three of the principal resident companies. So this is not like a stranger employer at the Tobin Center in the ballet. They regularly perform for the ballet, as for the opera, as for the symphony. Okay, but they're a stranger as to the fight between the two licensees. I mean, the musicians could have had an agreement with the ballet, just like they did with the opera. Tobin Center could have, or they could have in their use agreement with Tobin Center, all of them reached this issue of the canned music versus the live music. So I think the point I want to emphasize is that in the case law, a demand to hire union members, a demand on an employer to hire union members is right at the core of Section 7 protected activity. So in Phelps Dodge, which is a very early Supreme Court case, in this court's decision in Venetian Casino Resort, these are, I mean, it's just, it's not, as you say, it's not disputed in this case. But that demand to hire union members, and here, it's not a stretch at all, as we've shown and is clear in the record. You know, the musicians, they work for all three of these organizations. So, yes, they are not employees of the Tobin Center, but this is the locus. This is the physical location where this core labor dispute is taking place. They're not talking about a labor dispute at some other location. You know, the ballet only performs, in fact, at the Tobin Center. I guess I had a similar question to Judge Henderson, which is that it's true that in this case, the Tobin Center has arrangements with both the symphony and the ballet. You could imagine a situation in which the ballet just performed elsewhere. And the employees would have no particular association with that other place because, as you rightly say, the symphony employees primarily perform at the Tobin Center. So then you could imagine a situation in which then the symphony employees want to go to the Tobin Center and try to put pressure on symphony consumers. Because there's some overlap between symphony consumers and ballet consumers who, by hypothesis, work elsewhere, who are performed elsewhere. And then, as Judge Henderson points out, from the perspective of the property owner from the Tobin Center, they're probably thinking, well, why is all this happening on my property? Because I don't have anything to do with the ballet. You're complaining about what the ballet is doing. The ballet is performing somewhere else. But why am I being required to accommodate the leafletting on my property for a ballet that doesn't even perform here? Now here, it's true that the ballet does perform there, but you could sort of say, well, that happens to be true, but it's still one extra step removed because the Tobin Center just happens to contract with both the symphony and the ballet. And so it's a little different than the New York, New York situation where the reason ARC employees are there on the property is because those are ARC restaurants. Those are ARC food establishments, and they're trying to tell the folks there, well, look, ARC ought to be unionized. And this one just feels one step removed. Now, one answer is, even if the board could make something of, one possible answer is even if the board could make something of that, that there's nothing in the board's decision that suggests that there was any, that they saw a distinction between this situation and the New York, New York situation. So at least, you know, the board would have to spell out why that could matter. But I think you understand the factual point, which I think, I hope I'm not mischaracterizing anything. And what you just stated, Your Honor, is what I was going to say, which is that the board did not base its decision in any way on that distinction. And I would, again, this is a different arrangement than New York, New York, but I would push back against the idea that it's a less direct Section 7 interest. I mean, it's obviously, it's just a different arrangement when you have three performing arts companies working at the property. But what this court has instructed is you look at the property interest, which is, in this case, is an interest that, you know, deals with management of the property and is mediated through the contractual relationships between the property owner and the employers using the property. But Mr. Ginsburg, I guess a difference is that these employees are not trying to unionize vis-a-vis the ballet, right? No, I think it's clear from the record that they're trying to, they are unionized already. They're trying to obtain work, whether directly with the ballet as it did with the opera. They could either work directly with the ballet as they did with the opera or through the symphony. And I think the record's quite clear that they could, either way would be a way in which they were pursuing their own Section 7 interests. Let me ask you something, Mr. Ginsburg, that you said that raises a hypothetical question. You said the thrust of the leaflet was hire union members. And as you said that, I thought, instead of canned music. What would you say if they replaced, if the hire union members as opposed to robots? I would think that would be a legitimate Section 7 complaint. I mean, I guess I'm not sure that I see the distinction. I agree that both are right at the core of Section 7. These are employees seeking work for themselves, whether it's instead of recorded music or robots. Well, in other words, you would think hire union members as opposed to non-member union, non-union members. And here we have hire union members rather than using canned music. And my question was, and I know it's not raised here. Assuming that's a Section 7 right, would a Section 7 right be even clearer if the message were hire union members as opposed to robots on an assembly line, let's say? Perhaps. I guess I think, as the record shows, the musicians here signed a separate collective bargaining agreement with the opera to perform Macbeth. They reached a different deal. If next season, when the opera wanted to perform Macbeth again, they decided to perform using robots. I think that the musicians' interest on being on the property and handing out leaflets saying, use live music, use union members, not robots, would be pretty close to identical to what was going on here, right at the core of their own personal non-derivative Section 7 rights. Okay. Thank you. Thank you, Mr. Ginsburg. We'll hear from Roger Potsky now, and we'll give you some rebuttal time. Thank you. Ms. Roger Potsky. Thank you, Your Honor. May it please the Court, my name is Meelakshmi Rajapaksa, and I'm counsel for the National Labor Relations Board. The Board, in this case, reasonably exercised its discretion to revise its standard for determining when the off-duty employees of an on-site contractor have a Section 7 right of access to the property not owned by their own employer. And I guess I will kind of cut to the chase, in a sense, and address this idea that the Board's test is arbitrary or overly strict. The first part of the test, to be clear, consistent with the Supreme Court's decision in Hudgins, really tests and evaluates the employee's Section 7 interest in leafleting or engaging in Section 7 activity on this property. So that is where the regularly and exclusively requirements come in. At the second stage of the test, the Board considers, and this is assuming that the employees do work regularly and exclusively on the property, the Board proceeds to the second question of alternative means, which is, again, consistent with the Supreme Court's decision in Babcock and Wilcox, that Section 7 rights surely should be accommodated, but with as little destruction of property rights as possible. Can I direct you to the first part of the test, then, and what we called 1A and 1B versus 2? So let's just say 1A is regularity, because I just want to talk about regularity for a second. Okay. And then there's going to be some questions about how all these interrelate and whether 2 can be deemed to be independently sufficient. But just to isolate 1A for a second, regularity. So in regularity, the Board's decision says at footnote 56 that, for example, a contract for an employee who stocks vending machines once a week at the property owner's facility works regularly. And then the Board's decision goes on to say regularity is not satisfied here because it's only 22 weeks. I don't understand how that's consistent, because if 1 out of 7 is regular, how is 22 out of 52 not regular? I think the Board looked at the record, the specific record of this case, Your Honor, and what the record shows is that these musicians have a variable weekly schedule. Sometimes they don't work at the Tobin Center at all. Sometimes they work just a few hours a week. So there's nothing, as far as I can tell. You could conceive of regularity in two ways. I grant you that. One could be regularity means frequency, and that's where 1 seventh and 22 out of 52, you do a comparison. You could have another conception of regularity that's sort of like definite and predictable, like it's Monday, Wednesday, Friday, as opposed to three days for you to choose, and therefore we don't know. But I see nothing in the Board's decision at all that talks about that second form of regularity. It's all about frequency. And when they apply the test to these facts, all the Board says is it's only 22 weeks. That's all that's said. And if that's true, I don't understand how 22 out of 52 is not regular, but 1 out of 7. And even 1 out of 7 is overstating it, because when the vending machine person goes, they're not there for the entire day. They're only there, presumably, for a few minutes to restock. So you're talking about one day, but a few minutes of that one day. But still, I'll just grant you the full day. But if 1 out of 7 is regular and we're only talking about frequency, how is 22 out of 52 not regular? Right. The Board defines regular somewhat in opposition to sporadically or occasionally or on an ad hoc basis. And so I think the Board's view in this case, and this is clear from its application of the regularity requirement to the musicians, the Board looks at whether there is some kind of uniformity in terms of their, literally, regularity in their presence on this property. And so the Board was, yes, looking at the 22 weeks. But I think the Board is also looking at how much, whether there's any sort of uniformity. Would you grant me then that I don't see uniformity in here at all. I don't see it. And I'm not even sure. I'll get to this question, too. I don't even understand how uniformity could possibly matter. But anyways, would you at least grant me that if we're only talking, if we're talking about what I take to be the normal understanding of regularity, especially for purposes of what the connection is to the property, which is frequency, I can understand why frequency has a direct bearing on significance of connection to property. Because if there's a difference between somebody who works at a property one week out of 52 and somebody who works 51 weeks out of 52, that's just a different level of connection. So if we're talking about frequency, would you grant that it seems arbitrary to say on one hand that one out of seven is regular and 22 out of 52 is not? No, no, Your Honor. I don't think... No, even on frequency, you would say it's okay to say that one out of seven is regular, but 22 out of 52 is irregular. The Board is not applying a frequency requirement. The Board is... I don't see how it's not a frequency requirement. What I see in this opinion over and over is it's only 22 out of 52, which all I read into that is frequency. If that's the way I read it, and I totally, I'm not trying to deny you the argument that my premise is wrong. I'm just asking you for purposes of argument to accept the premise. If you accept the premise, it seems to me arbitrary to say on one hand that one out of seven is regular, but 22 out of 52 is not. 22 out of 52 is less than half of the year. So is one out of seven. It's more less than one half of the year than is 22 out of 52. That's the point, is that one out of seven is less than 22 out of 52. So how can the first one be regular and the second one not? Right. This is where the idea of intervals, I think, is important. Okay. So on frequency, then that just means on frequency, if it's... I have not heard you say, and I think I understand why you wouldn't, because I don't see how one could say, that if it's just a frequency-based determination, then one seventh has to... If one seventh is regular, then 22 out of 52 has to be regular too. Then we have to get to whether regularity actually means something different from frequency, like, you know, definite intervals. And on that, A, I don't see anything in the opinion that says that. But even if it did, I don't understand that because, for example, employees all the time take vacation. They get two weeks of vacation. No one knows when that vacation is going to happen. They just pick when it's going to happen. So the fact that you don't exactly know what happens in a particular week, I don't understand how that bears on the strength of the connection to a property, the property in a way that would really tip the balance. Well, the board, Your Honor, that's precisely the point of the board's decision, is that the board doesn't look at individual employee schedules in making this assessment about regularity or exclusivity. The board is looking at the contractor's presence on the property. But even the contractor's presence on the property, I didn't mean to draw the distinction between contractors and employees. I'm saying even the contractor, if you know that they're going to work there, the contractor is going to be there 22 out of 52 weeks. And you know that there's 13 weeks as to which they can't be there at all because it's a 39 week season. So we're talking about which 22 out of the 39 weeks. That's really the question, right? And if we're talking about which 22 out of the 39 weeks, what does it matter that you don't know which exact weeks it is? If it's if it's 22 out of 39, we know it's 22 out of 39. Why does it matter if we don't know exactly which weeks it's going to be? And by the way, I'm not even sure that you don't know. But even if you assume that you do, even if you assume that you don't, why would that matter? The board really is, again, your honor, I don't want to reject the premise of your question. But the board really said regularity and it meant regularity and it distinguished regularity from sporadic or occasional. So seasonal nurses in, you know, Beachtown who then go to the ski areas in the hospitals and the ski areas in the winter, not covered because they're coming and going. It's not that they're not covered by the act. They certainly they certainly could be. And they in this case are. The question is just whether they have a Section 7 access. Right. And the board's position is that these these employees, first of all, start out as non employees of the property owner. And that's sort of the linchpin of the board's decision because they're non employees. Of course, their right of access is more restricted than the rights of employees of the property owner. And so corresponding to that, it's a more it's a more demanding test. So in terms of the board's understanding of how much latitude it has it had under New York, New York one. In your view, could could the board have just said, OK, these are not employees of the Tobin Center. So the Babcock Leach mere standard applies to them, period. Without I know I know the board hung a lot on this burdenship, but without that, is that as as you read New York, New York, is that permissible under New York to just to go all the way to the poll of of non employee. Right. I think that the board's excuse me, the court's 2002 New York New York decision does give the board that latitude to determine the status of these employees for access purposes. And so the board and the court specifically said employees or non employees. The board in New York, New York and this case shows kind of an intermediate position where it's it recognizes that these are employees of an employer. So they are, broadly speaking, employees under the statute. But so it's the board's position that they actually don't need to be between the polls of the non employees who are who have no section seven rights and leach mere and employees of an employer that owns the premises. They could be they could have no no showing whatsoever alternative means just they're just not because they're on a lessee's a property that's leased to their employer. That's, that's, you know, access rights. They have no right that's that was open to the board to do that was open to the board. The board did not choose that path and the board has always maintained that this This situation is not governed by leach mere or Babcock. And there are distinctions, to be fair, between employees under the statute and non employee union organizers and the board's decision is very rational in the sense that It takes that distinction into account, just as much as it takes the distinction between a property owners employees and these contractor employees into account. And that's both in New York, New York, and in this case. So, so in this in this case, the The Tobin center did not have a burden before the ALJ when the record was being developed to show adequate alternative means That's right. So it can have met that burden. Well, on the record, it didn't meet the burden, though, because it was able to show it did a deuce evidence that these employees leaflet in without any problem across the street from the Tobin center and it also reduced evidence that they that they handed out hundreds of leaflets over the course of the weekend. But there's no there's no findings on those facts by the LJ Right, but the facts are in the record. And so the board relied on the facts in the record. And they the union was not aware whether it had to dispute numbers of leaflets or distances from where the traffic was going or proportion of patrons who are getting out of valet parking on the, what's the name of the circle the auditorium circle or you know what I'm talking about. Yes, I do. But I don't know the name. Yeah. So that but so there was no exploration of those facts before the LJ auditorium circle. Well, there was your honor in the sense somewhat in the sense that, you know, there is under New York, New York, this idea of interference with the property owners business. That is sort of the second stage of analysis under New York, New York, which is what the LJ applied. And so the parties were on notice that these concepts of interference were at issue. And in the course of litigating that these these facts came in about where the musicians leaflet and where they blocking ingress and egress and things of that. I thought that was that the, the principal rule was simply We have a no leaflet thing we have no solicitation policy and therefore everything has to take place off our property and that wasn't contested that was that was the property owners. Property claim. So there was no interference with its property and then you had the leaflet errs outside the perimeter. And then the question becomes they're outside the perimeter. So there's full protection of the property rights are there. Are they being given an adequate alternative means of serving their Section seven access rights and that's not an inquiry. Is it under New York, New York. No, I mean, And so, so whether the flow. I mean, where were do we do we know on this. I'm looking at Jay for 86. Do we know on this exhibit. There's, there's numbers and letters on here where the where the ballet patrons enter the building. Is it across from Veterans Memorial Park and that main sort of colonnade entrance or Right, we do. We do know from the record that they entered they reached the main entrance from multiple different points. So there are Just for my benefit. Is it the that big entrance. Yeah. From the plaza. Right. Veterans Plaza sort of the curved part of the pacing toward the river. Right, right. And so the the musicians wanted to leaflet on the perimeter around that plaza to get to catch patrons coming in from different points, but they were actually able to reach at least some patrons from across the street from the Tobin center. So they were across the street. Were either in Veterans Memorial Park or across auditorium circle away from the building. I believe it was across auditorium circle. On the on the sidewalk there so people would be coming into valet park, they would get out and they would walk straight over to the Guess is that the West toward the entrance. Right. And there's also there are also multiple parking lots. Right. And so theoretically am and do you know where those are on the I don't actually your honor. I don't have the the map in front of me, but there was Not in the record where I mean I think that might have been in the in the record, but not the record that was that was supplied to us in the appendix. I don't think that part was included about where most people were coming from and parking and what they're walking paths would have been I can look again at what was put in the joint appendix, your honor, but I believe the I believe all of the maps were put in Mr Ginsburg might be more able to clarify this than I would be, but The, the, the point is that there were surrounding parking lots and there was valet parking and some of the patrons did enter By crossing the street to the Tobin Sarah, they necessarily would have come in contact with the leaflet or Sure, as they were crossing so So if the if this were different facts and I recognize this is a different hypothetical if there were a freestanding theater that theater company leased from a property owner and the property owner said, Look, it's all yours to do with as you wish. Let's say year round, just to put the set the first prongs A and B off the table. But the property owner provides security and has a policy of no leafleting In that case, if the Property owner is enforcing that Against employees of the theater who want to leaflet on theater property. Let's say like this sidewalks around a theater that are owned by the theater. No, no section seven rights because in fact, in that situation, they're not employees of the property. I just want to make sure that I'm following. So the though the theater is leasing the property from the property owner and its employees are attempting to leaflet. I think that would be a different situation, Your Honor, because these are this this case is specifically about contractors contractor employees. So in your hypothetical the There's no contractor relationship. But it would be. I mean, the contract here is a lease agreement. Right. It's a license agreement for the symphony to be present. So would be kind of like it's a contractor of the property owner in that sense, their employees of the theater company. But they're But their contractors with contract employees with visa v the property owner. They're not the employees of the property owner. Right, right. So there. So in that sense, they are they are the employees of a licensee of the property owner. And I just want to understand what, if anything, would distinguish that case from this case. And I understand all the the one a one be, you know, regular and exclusive but putting that aside, you know, and just looking at this access question. Why wouldn't the same access analysis be applicable there. If, well, if the if if the relationship. In fact, is a contractor. Relations a license property owner. Then this test would apply. This test would apply. Yes, but it's a little, I will say, Your Honor, it's a little bit complicated because in a lease situation. The, the lessee gets exclusive possession of certain parts of the property and theoretically, they could control within their leasehold. You know the what employees have rights to do and so on. And then section seven would apply a little differently within the lease. Right, but I'm just thinking if I mean if I were a theater company and I wanted to provide the kind of I wanted to rent, you know, Lisa theater and one was offering me some security and a no hand billing policy and the other wasn't, I would think, you know, fewer, fewer problems for me. I'm going to, I'm going to You know, put this property owner in the same Relationship with with the employees as as the Tobin here and I get. I mean, I grant putting aside the fact that there are in fact multiple licensees at the Tobin Center and So, Getting to the question about the the alternative means there's a mention in the there's no testimony about this. I don't think, although you'll correct me if I'm wrong. About the use of social media or any finding of adequacy of kinds of social media, but the board does talk about on the one hand. Avenues of distributing handles from across the street, but also about social and mass media. If the musicians here. We're not able to distribute leaflets across the street would could the NLRB have reached the same conclusion on this record that it reached because of the availability of of mass and public media, social media. I think that is the board's position is that in this case that those other avenues would have been reasonable alternatives. And again, and I think the board explores this somewhat at page nine of the slip opinion. Where it talks about the alternative avenues analysis. In this case, the employees were attempting to communicate with the general public. And for that purpose, Facebook and so on. And especially because they were ultimately trying to direct people to a Facebook page with a QR code. Electronic means would have been adequate in the board's view, but it in terms of the application of this and other cases. It is not the case and the board is pretty emphatic about this is not the case that in every situation and a property owner can simply say Facebook or Twitter and they will be relieved of their of their burden to show anything further. And there's more about that. How do we, what do we know about that. Well, at footnote 85 of the board's decision, the board says that it will not speculate about what would constitute Reasonable alternative non trespassing means in in every case or in any other case, and the board is simply in this case, saying that such means could be reasonable, especially because increasingly employees are communicating both amongst themselves and with the public through electronic means. I'm sorry, I said footnote, which It was 85 Can I take you back to exclusivity for one second, because there's there's a link here too. So I'm not understanding why exclusivity matters, except that in prior decisions, at least from the descent, the dissenting member that was relied on by was it Hayes. I can't remember, but That was relied on. There's a suggestion that exclusivity matters because in a non exclusive situations. There are other places where the Section seven rights can be exercised because there's other property. Right. Is that the way in which exclusivity matters or is there some other way because I don't understand as a rational matter why exclusivity matters, other than that. Right. I think that is the that is the rationale for the exclusivity piece of the analysis and the board. The board does kind of say by by way of a quote from the Postal Service case. Page eight of the decision that when employees work regularly and exclusively, you have kind of an East Tech sort of situation that arises where they have no other Place know where the workplace where they can exercise their section seven right so of course the board takes that seriously. And that becomes the jumping off point for access. So then if that's the only way in which exclusivity matters. And I think I agree that that is the only way I can understand why exclusivity would matter because otherwise It seems irrational to think that if you work on a property five weeks. Then the fact that you happen to work only only on that property for those five weeks somehow gives you a greater connection to a property than one in which you work for 22 weeks, but then you work for a handful of weeks somewhere else to Right. So, so then if we're only talking about the fact that there's another avenue that's available another place another piece of property that's available for the exercise of section seven rights, then Does there have to be some kind of assessment of whether in fact the other places available or how it stacks up because otherwise, why does it Why does it matter if Do you see what I'm saying that it's in theory possible that there's some other place. Now we have no idea what the strength of the connection is to that other place, though. And it could be that that other place. If you're only working there for one hour a year. And you're spending 99% of your time at Location A and 1% of your time at Location B, then it could very well be the case. I mean, if I were property owner be I would probably be thinking, wait a minute. That means that the leafling has to occur on my property instead of the place where 99% of the activity occurs that I'm not understanding how that squares, unless you take into account the availability of the other property, but maybe I'm missing something Well, the board isn't getting into those fine assessments, Your Honor, about how long people spend As a proportion of all their working time at various different properties. The board is really laying down kind of a bright line rule that in order to in order to acquire an access right These employees have to work exclusively at this property. So even if they work one hour elsewhere. Unfortunately, that is sufficient to sort of break the necessary connection in the board's view, but it has to But there has to be a reason that matters. Now, of course, mathematically, you're right that there's a difference between You know 90% and 100% that's just math. That's a mathematical identity and nobody can dispute that. But there has to be a reason why The difference between 90% and 100% matters in a way that's commensurate with the values that are in the balance. And I guess it's not apparent to me. Why that difference matters unless it's because there's another potential forum that's available. And if that's true, then the other potential forum, it seems to me has to be available or else there's no difference. Right, the board really didn't address in this case, the situation that you're talking about your honor. Because in this case, it was abundantly clear that there. These employees don't work exclusively on the Tobin centers property for this contractor and that's sort of where the analysis ended. As far as that first part of the case. So the board didn't the board didn't get into. I think the analysis that the union is suggesting, which is more of a practical assessment of where employees actually can exercise. I'm not sure. It's just a practical question. It seems to me is a theoretical one in that To focus on exclusivity, there has to be some reason why that focus makes sense. It can't be just arbitrary. You can't just say, well, we care about exclusivity. Well, why because exclusivity matters. I mean, that's just how the logical so it Doesn't tell you anything. And so that's me some underlying value that's being served by focusing on exclusivity and the underlying value is There's the potential availability of another forum. It just seems to me that there would have to be some work done in association with that or or or else it's just exclusivity for exclusivity sake, which I'm not quite following what I think the board is coming at this a little bit differently, though, Your Honor, you're, you're talking about the availability of another forum. The board actually is concerned with whether this is the only forum like it's it's looking at the connection to this property and not the availability of other properties. Do you see what I'm saying the the board is literally concerned with what it said in its decision whether there is no other place. And that, and that is all the board is not looking at it. Are there available other places it's framing the question a little bit differently. Is the salience of that from the perspective of the leafletting employees are from the perspective of the property owner on whose property the leafletting occurs. I think the board is looking at the perspective of the employees. If there's no the board is concerned about whether these employees truly have no other place. And so that it's sort of, but it also does, of course, take into account the property owners right to exclude and the fact that the property owner could well say, well, why my property. And the answer would be because these employees have no other place to exercise their section seven rights and that is why some some dislocation of your rights as necessary. In terms of the application. I know I far exceeded my time. I won't get into it unless unless the court has questions about the facts. What we're just going to say. Oh, no, I was just going to recap that on in the board's view I take judge string of us and point that 22 weeks may seem fairly substantial, but then in the board's view, respectfully, that does not suffice to meet the regularity requirement. And obviously the record is very clear that these employees don't work exclusively on the Tobin centers property. So really, the, the board could have stopped there, but it did proceed to the second stage of the analysis. And I just want to briefly say in terms of a point that was raised earlier in this argument. The board could theoretically if it knows that the employer is going to win on the second stage of the analysis, it could assume for the sake of argument that the first stage is met. And that's how it would kind of get to the second stage. And with that, I will close. Thank you very much, Your Honor. Thank you, Miss Roger box. Mr Ginsburg will give you your two minutes of rebuttal time. Thank you. And I'll be brief. First, I just want to reiterate, we, we believe that if you agree with us that the board's Application of its first step of that board. The first step of the board's test is arbitrary and its application to the facts of this case was was unreasonable that you should remain this case to the board. You don't need to reach the second step. No guidance on that. We don't need to give any guidance on second step. Well, I think in some of the discussion that we Reasons that Miss Roger proxy just said, it seems like actually the second step is where all the action is because if it's such a weak easily met standard, then it's could always be the avenue taken Yes, and and and absolutely I this court should give guidance and and what I what I would say is that The reason the first step is dispositive here is that you can't rationally do the second step, the balance the in a real way of determining whether alternative means of communication are reasonable. Without knowing the strength of the section seven interest at issue. So, and that is guidance that this court could provide to the board so So for here, for example, the board said, you know, these were communications to the general public so it could be done across the street or by social media, that's fine. We don't think that's what the record shows, you know, here, the, the employees, the musicians were seeking to specifically communicate with people who are entering the ballet for the opening performance of the ballet. Sure, they caught some of them across the street. But as the ALJ found, you know, standing closer to the entrance was going to catch basically all of them. And imagine, you know, the board's rule applies to the, the musicians, if they had a contract to speak with the symphony overpay, for example. And if an hour before the symphony's performance they handed out leaflets saying hello patrons, you know, please, you know, us were the musicians. Please support us in our contract to speak with the symphony. What, you know, please call the symphony under the board's rule they couldn't do that. And yet, that's exactly the same section seven activity that was that issue here. So if there are no further questions. That's not right. And on on the on the symphony. You're saying that would be the same role because the symphony is also a contractor or would The board, the board's rule said the board's rule. It's finding here would apply to the musicians when they sought to leaflet. If the symphony was performing as opposed to the ballet, excuse me. Right, because, and so the out because they found that the musicians were not regularly and exclusively employed at the location. I mean, I will continue if you'd like, but I know I didn't think so. No, I just I think I understand that point. Yeah. So, so, and we think that you know that that can't possibly be the case. And so that any any balancing at the second step needs to take into account what section seven interest is that issue. Here, it's clear that the issue is a personal non derivative interest of employees who work at the location. And so, you know, that's that is certainly some guidance that the court could give to the board on remand. How the board articulates its test as we've discussed throughout this argument would be, you know, there's a number of ways they could do it. But the point is, is that they have to have a test that considers both the property interest and the section seven interest and balances them and you have to know what the section seven interest is in order to accommodate accomplish that balancing isn't the section seven. At what level of granularity, does one parse the section seven interest. I mean, if you have the same ability to proceed to communicate with members of the public as you do with your own employer. And so these patrons communications the patrons are fair game. What more about the nature of the interest would cast light on The alternative means. I mean, I get your point about the ballet patrons being the target. And so you have to assess whether the alternative means allows them to reach those. I understand that. But are there other actors that would bear on the strength of the section seven right that you're thinking about that would be so much more case by case variable inquiry, the section seven inquiry. Well, I mean, there are other factors, but they don't particularly come into play here because here all the musicians were doing we're standing in an outside non working area of the property and it's very clear from the boards in this court's case law that that's That's generally a place that's appropriate to communicate with customers of your employer, you know, New York, New York lean very heavily on it. And that's what that was about. So There are a number of questions that can be raised in those cases in Nova southeast, which is one of the cases discussed that's from this court. There was some discussion about the particular location where the employer does not have a leasehold interest, but there's, you know, there the employee was leafleting in the parking lot. He was leafleting to his co employees and they said that's you all you the board said and you affirmed that that was an appropriate Locus because that's where the communication notes naturally would take place. So there are those sorts of concerns there they run throughout the board's decisions over many years and this court's decisions. But again, I think In this case, speaking to the customers as they enter the, the, the, the very door of Tobin center about the labor dispute is is outside in a non working area is is firmly within the board and this court's sense of what is a traditional and appropriate place for employees to exercise their section seven rights. If you don't counteract the property owners rights. Right. And we acknowledge Observation. You know, right. And we acknowledge that there has to be some balancing but balancing that takes takes account of the section seven interest of the employees, which in this case we think are very strong as they as they. This is where they. This is where they work. Is there no further questions. So we'll rest. We have. Yes. Thank you very much for your time. Thank you counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Henderson, Pillard